IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE


Civil Action No. 12-cv-02367-LTB-BNB


DOUG HITCHENS & SHERYL HITCHENS,

      Plaintiffs,

v.

THOMPSON NATIONAL PROPERTIES, LLC,

      Defendant.

_____

## ORDER
_____

      This matter is before me on Motions for Summary Judgment filed by Defendant

Thompson National Properties – seeking dismissal of Plaintiffs Doug and Sheryl Hitchens'

claims – as well as a Motion for Summary Judgment filed by Plaintiffs – seeking judgment in

their favor as to Defendant's liability.  [**Docs # 28 & 29**].  Oral arguments would not materially

aid in my determination of these motions.  After consideration of the parties arguments, and for

the reasons stated, I DENY IN PART AND GRANT IN PART Defendant's Motion for

Summary Judgment [Doc #28], and GRANT IN PART AND DENY IN PART Plaintiffs'

Motion for Summary Judgment [Doc. # 29].  The Plaintiffs' motion is granted in favor of

Plaintiffs as to liability on their Breach of Guaranty Claim.  Defendant's motion is granted on

Plaintiffs' Unjust Enrichment Claim and otherwise denied.

## I. Facts

The Parties provide that the following facts are undisputed.

Defendant Thompson National Properties ("TNP") was formed in February 2008, by Anthony Thompson for a claimed purpose of investing in the recessionary real estate market. [*See* Doc. # 34].  The company was to acquire different investments, including commercial properties, real estate loans and operating companies.  [*Id.*]  In an effort to raise the funds needed to finance the investments, an aggregate principal amount of up to $18,000,000 of 12% notes due June 10, 2011 were offered by the TNP 12% Notes Program, LLC ("TNP 12%"), in accordance to a Confidential Private Placement Memorandum ("Memorandum").  [*Id.*]  The offering was made to investors across the United States, including the Plaintiffs.  [*Id.*]  Investors were required to invest a minimum of $50,000.  [*Id.*]

TNP 12% raised over $21,000,000 from 418 investors.  [*Id.*]  Of that amount, TNP 12% took approximately $2.5 million off the top for its fee.  [Doc. # 28, Ex. 6, p. 2].  Of the remaining $19,000,000, TNP 12% used $10,000,000 to purchase real estate. [Doc. # 34, Ex. A, p. 7].  Five million dollars was "used to acquire the rights to manage a sponsor's portfolio of 26 [] properties purchased for $700,000,000 in 2005." [Doc. # 28, Ex. 6, p. 2].  Eleven of those properties were then lost to foreclosure.  [*Id.*]  TNP 12% used over $8,000,000 of the funds raised from investors to pay those same investors interest in their notes.  [*Id*].

On April 9, 2009, Plaintiffs purchased a note in the amount of $100,000 (the "Note") from TNP 12% and a corresponding Guaranty Agreement from TNP.  [Doc. # 28, Ex. 1 & Ex. 8].  Pursuant to the Subscription Agreement (the "Subscription Agreement") with TNP 12%, the Note would become due June 10, 2011. [Doc. # 28, Ex. 1].  Under the Note, TNP 12% was

obligated to pay interest at 12%, and repay the principal of the Note in a lump sum on June 10,

2011, subject to any extension. [*Id.*; *see also* Doc. # 34].  TNP and TNP 12% did not issue a

physical certificate for the Note, but held all notes in "book-entry" form. [Doc. # 34].  Interest on

the Note was 12% and accrued quarterly and was payable on the 15th day of the month

following the end of each calendar quarter. [Doc. # 29].  In the event of an extension of the term

of the Note, the interest rate would increase by one quarter.  [*Id.*]

The Subscription Agreement states that it is "subject to the terms, conditions,

acknowledgments, representations and warranties stated herein and in the Confidential Private

Placement Memorandum relating to the" Notes. [Doc. # 28, Ex. 1, p. 1].  Under section 12(b) of

the Subscription Agreement, an investor cannot cancel, terminate, or revoke the agreement. [*Id.*

at 5].  Section 12(c) of the Subscription Agreement provides as follows:

> [T]his Subscription Agreement and the Memorandum, together with all
> attachments and exhibits thereto, constitute the entire agreement among the
> parties hereto with respect to the sale of the Notes and may be amended, modified
> or terminated only by a writing executed by all parties (except as provided herein
> with respect to rejection of this Subscription Agreement by the Company).

[*Id.*]

A Confidential Private Placement Memorandum (the "Memorandum") was also provided

to all Note holders in the TNP 12% Notes Program, including Plaintiffs.  [*See* Doc. # 28, Ex. 2].

Under the terms of the Memorandum, all notes issued under the program were to bear non-

compounded interest at the annual rate of 12%.  [*Id.*]  The notes were set to mature by June 10,

2011.  [*Id.*]  However, the company at its discretion could extend the date of maturity for the

notes for up to two one-year terms. [*Id.* at Ex. 2, pp. i, 5, 6, 17].  Under the terms of the

Memorandum, TNP 12%'s obligations were unconditionally guaranteed by Defendant. [*See Id.* at p. 6]. Additionally, the Memorandum provided that TNP 12% is not obligated to redeem the notes prior to the date of maturation "[u]nless an event of default under the Notes exists and the Note holders elect to declare the Notes due and payable." [*Id.* at p. 17].

As part of the Memorandum and Subscription Agreement, and the offering, Defendant executed a Guaranty Agreement unconditionally guaranteeing the obligations of TNP 12%. [*Id.* at Ex. 8]. The Guaranty Agreement is "governed by and construed and enforced in accordance with the laws of the State of California." [*Id.*] Thus, TNP 12%'s obligations under the Note were unconditionally guaranteed by TNP. Specifically, the Guarantee provided that TNP:

> unconditionally guarantees the performance of all of the Company's obligations under the Notes, including, without limitation the payment of principal and interest (as such terms are described in the Confidential Private Placement Memorandum dated June 10, 2008 for the sale of the Notes) as provided therein. This Guaranty shall remain in full force throughout the term of the Notes.

[*Id.*; *see also* Doc. 3-2, Ex. B]. The Guaranty Agreement also states in pertinent part as follows:

> Guarantor acknowledges that the Noteholders may, by simple majority vote or consent, appoint one of them or a third-party attorney or agent, to prosecute the Noteholders' rights hereunder and such party shall be entitled to bring any suit, action or proceeding against the undersigned for the enforcement of any provision of this Guaranty on behalf of all Noteholders .

[Doc. # 28, Ex. 8; *see also* Doc. 3-2, Ex. B]. Additionally, the Guaranty Agreement provided that TNP agreed to "pay any costs or expenses, including the reasonable fees of an attorney, incurred by the Noteholders in enforcing this Guarantee." *Id.* The Guaranty Agreement was provided to investors "[i]n order to induce each prospective purchaser . . . to purchase the Notes." *Id.*

On June 10, 2011, TNP 12% elected to extend the maturity dates on the Notes to June 10, 2012.  [*See* Doc. # 28, Ex. 4].  On March 28, 2012, TNP 12% elected to extend the maturity on the Notes to June 10, 2013.  [*See* Doc. # 28, Ex. 5].   TNP 12% made interest payment to Plaintiffs pursuant to the terms of the Note and indicated that the interest rate would be 12.5% after extension on March 28, 2012.  [*Id.*; *see also* Doc. # 29].

By 2012, TNP 12% was sustaining substantial operating losses.  [Doc. # 29].  In the summer of 2012, TNP 12% defaulted on the Notes and stopped making interest payments.  [*Id.*]  On June 26, 2012, Plaintiffs demanded that TNP and TNP 12% redeem the Note.  [*Id.*]  TNP 12% then sent a letter to Plaintiffs indicating that all interest payments were deferred through the end of 2012.  [*Id.*]  TNP and TNP 12% indicated that they intended to pay all remaining interest and principal on or prior to the maturity date of June 10, 2013.  [*Id.*]

On October 12, 2012, in an effort to avoid redemption of all of the notes, TNP 12% and TNP wrote to its Note holders seeking to re-structure and modify the debt of the TNP 12% Notes Program. [Doc. # 28, Ex. 6, p. 3].  In this "Consent Solicitation" offered by TNP 12% in late 2012, the companies (TNP and TNP 12%) requested that the Noteholders agree to reduce interest, extend the maturity date and waive defaults under their respective notes.  [*Id.*]  Specifically, TNP 12% asked its Note holders to (1) extend the maturity of the notes to June 10, 2016; (2) modify the applicable interest rate to 3% in 2013, 4% in 2014, 5% in 2015, and 5% in 2016; and (3) waive any prior defaults under the notes and waive any interest due on the notes and unpaid in 2012.  [*Id.*]

The Consent Solicitation did not reference any part of the Solicitation Agreement or Memorandum that permitted TNP 12% to modify the terms of the Notes in this manner.  Rather, TNP 12% simply proclaimed that "[t]o approve the proposal being contemplated in this Consent Solicitation, the affirmative vote of Noteholders holding a majority of the outstanding principal amount of Notes must be cast in favor of the proposal."  [*Id*. at p. 4].

On November 7, 2012, TNP 12% received majority approval to proceed with the modification.  [Doc. # 28, Ex 7].  Ultimately, 60.52% of the Note Holders voted for the modification.  [Doc. # 28, Ex. 3, ¶¶ 8, 9].  However, Plaintiffs rejected the proposed modification to their Note and continued to demand repayment.  [Doc. # 29].

Defendant contends that summary judgment in its favor is appropriate here because, the principal (TNP 12%) has not defaulted or breached under the terms of the Subscription Agreement or any other underlying obligations to Plaintiffs.  [*See* Doc. # 28].  As such, Defendant contends that Defendant cannot be held liable as a guarantor.  Defendant also contends that Plaintiffs did not have the right to redeem their investments prior to the date of maturity, which pursuant to the Consent Solicitation, has not occurred.  Lastly, Defendant contends that Plaintiffs' claims for unjust enrichment fail as a matter of law because an enforceable express contract exists covering the subject of this dispute.

Plaintiffs argue for summary judgment in their favor because they contend that Defendant breached its guaranty of the performance of all of TNP 12% Notes Program's obligations under the Guaranty Agreement issued to Plaintiffs.   They contend that nothing in the contract permitted Defendant to modify the terms of Plaintiffs' Note without Plaintiffs' consent,

6

as Defendant did in the Consent Solicitation.  Thus, Defendant breached the contract when it

failed to make the interest payments and failed to honor Plaintiffs' requests for redemption.

## II.  Standard of Review

Federal Rule of Civil Procedure 56(a) allows a party to "move for summary judgment,

identifying each claim or defense – on which summary judgment is sought."   Summary

judgement "is appropriate 'if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law.'" *Klen v. City of*

*Loveland*, 661 F.3d 498, 508 (10th Cir. 2011) (*quoting* Fed. R. Civ. P. 56(a)).  Under this

standard, the court must view the evidence and draw all reasonable inferences therefrom in the

light most favorable to the nonmoving party.  *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1124

(10th Cir. 2005).  A fact is "material" if, under the applicable substantive law, it is "essential to

the proper disposition of the claim."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th

Cir. 1998) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  An issue is

"genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve

the issue either way."  *Id.* (*citing Anderson*, 477 U.S. at 248).       Once the moving party has

properly supported its motion for summary judgment, the burden shifts to the nonmoving party,

who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts

showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 277 U.S. 242,

256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Where, as here, federal jurisdiction is predicated

upon diversity, the court applies the substantive law of the forum state.  *Barrett v. Tallon*, 30

F.3d 1296, 1300 (10th Cir. 1994).

### III.  Discussion

A federal court with diversity-based jurisdiction over a case, as is applicable here, applies the laws of the forum state in analyzing the underlying claims.  *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Essex Ins. Co. v. Vincent*, 52 F.3d 894, 896 (10th Cir. 1995).  Here, both the Subscription Agreement and the Guaranty Agreement provide that they should be "governed by the laws of the state of California."  [Doc. # 28, Ex. 1, p. 4 & Ex. 8].  Accordingly, I apply California law.

**A.**    **Plaintiffs' Breach of Guaranty Claim**

Defendant argues that Plaintiffs cannot prove a Breach of the Guaranty Agreement because: (1) "TNP 12% is not in default because the note holders voted to extend the maturity date of the notes and voted to waive all prior defaults," (Doc. 28, p. 11); and as a result (2) "TNP 12% has no obligation to redeem Plaintiffs' investment" because the amended maturity date has not occurred and Plaintiffs do not have a right to early redemption (*id.*).  I disagree.

A contract of guaranty is a secondary, not a primary, obligation, and can exist only when there is some principal or substantive liability to which it is collateral.  *Somers v. U.S. Fid. & Guar. Co.*, 191 Cal. 542, 217 P. 746 (1923); *Kilbride v. Moss*, 113 Cal. 432, 45 P. 812 (1896); *Powers Regulator Co. v. Seaboard Sur. Co. of N.Y.*, 204 Cal. App. 2d 338, 22 Cal. Rptr. 373 (2d Dist. 1962).  Under California law, a guaranty agreement is a contract.  *See Pugh v. Porter Bros. Co.*, 118 Cal. 628, 50 P. 772 (1897).  Here, the Subscription Agreement represents the original agreement and the Guaranty Agreement is its own contract.  Thus, I analyze Plaintiffs' breach of guaranty claim under contract law.  *Id.*

Under California law, an unjustified or unexcused failure to perform a contract is a breach.  The essential elements of this claim are: (1) the existence of a valid contract between the parties; (2) Plaintiffs' completed performance; (3) Defendant's unjustified or unexcused failure to perform; and (4) damages to Plaintiff caused by the breach.  *See, e.g.*, *Freed v. Manchester Serv.*, 165 C.A.2d 186, 189, 331 P.2d 689 (2d Dist. 1958); *see also*, Cal. Civil Jury Instructions (BAJI) 10.85 (2014).  A breach of contract occurs when a party to a contract deliberately refuses to do that which he or she has agreed and is required to do under the contract, *Spangenberg v. Spangenberg*, 19 Cal. App. 439, 126 P. 379 (1st Dist. 1912), when one of the parties repudiates a condition precedent to performance by the other party, *McManus v. Bendlage*, 82 Cal. App. 2d 916, 187 P.2d 854 (2d Dist. 1947); *Woodruff Co. v. Exch. Realty Co.*, 21 Cal. App. 607, 132 P. 598 (1st Dist. 1913), or when one party prevents the other from performing the contract in accordance with its terms, *Alderson v. Houston*, 154 Cal. 1, 96 P. 884 (1908).  Non-performance constitutes a breach of contract, and thus, a contract that lasts so long as the parties perform their obligations necessarily continues until a breach and the corresponding right to terminate the contract.  *Zee Med. Distrib. Ass'n, Inc. v. Zee Med., Inc.*, 80 Cal. App. 4th 1, 94 Cal. Rptr. 2d 829 (1st Dist. 2000).  There can be no breach of a contract until the time specified therein for performance is due.  *Taylor v. Johnston*, 15 Cal. 3d 130, 123 Cal. Rptr. 641, 539 P.2d 425 (1975).

Here, the first two elements are not disputed.  With regards to the third element, Plaintiffs contend, and Defendant denies, that Defendant breached the Guaranty Agreement.  The Guaranty Agreement provides that Defendant:

> unconditionally guarantees the performance of all of the Company's obligations under the Notes, including, without limitation the payment of principal and interest (as such terms are described in the Confidential Private Placement Memorandum dated June 10, 2008 for the sale of the Notes) as provided therein. This Guaranty shall remain in full force throughout the term of the Notes.

[Doc. # 28, Ex. 8; *see also* Doc. 3-2, Ex. B].  Thus, Plaintiffs contend that under the Guaranty Agreement they are entitled to their requested payment of principal and interest from Defendant because the Principal, TNP 12% (as relevant here, the Company) breached the Subscription Agreement by failing to pay interest, and after its failure, which would constitute a breach, failing to redeem the Note upon Plaintiffs' request.  [*See* Doc. # 29].  Defendant contends that it did not breach the Guaranty Agreement because TNP 12% did not breach the Subscription Agreement because it modified the terms of the Agreement through the Consent Solicitation approved by a majority of the Note Holders.  [*See* Doc. # 33].  Thus, to determine here whether the Guaranty Agreement was breached, I must first determine whether TNP 12% breached the Subscription Agreement.

As provided in the facts above, TNP 12% was not obligated to redeem the Notes prior to the date of maturation "[u]nless an event of default under the Notes exists and the Note holders elect to declare the Notes due and payable." [*See* Doc. # 28, Ex. 2, p 17].  Plaintiffs contend that an event of default entitling them to request redemption occurred when TNP 12% failed to pay interest due on the Note.  Defendant contends that a default did not occur because the majority of Note Holders approved an interest payment adjustment and later maturity date in the Consent Solicitation.  Plaintiffs reply that such an change to the Agreement was not permissible under the terms of the Agreement.  I agree with Plaintiffs.

The Parties do not dispute that TNP 12% stopped making interest payments on Plaintiffs' Note in July of 2012, after extending the maturity dates on the Note two times. [*See* Docs. # 28, 29, 33, 34]. Plaintiffs then requested that TNP and TNP 12% redeem the Note, to which TNP 12% responded by indicating that all interest payments were deferred through the end of 2012, and indicating that they intended to pay all remaining interest and principal on or prior to the maturity date of June 10, 2013. [Doc. # 29].

However, in an effort to avoid redemption of all the notes, on October 12, 2012, TNP 12% and TNP wrote to its Note Holders seeking to re-structure and modify the debt of the TNP 12% Notes Program. [Doc. #28, Ex. 6, p. 3]. This "Consent Solicitation" requested that the Note Holders agree to: (1) extend the maturity of the notes to June 10, 2016; (2) modify the applicable interest rate to 3% in 2013, 4% in 2014, 5% in 2015 and 5% in 2016; and (3) waive any prior defaults under the notes and waive any interest due on the notes and unpaid in 2012. [*Id.*] On November 7, 2012, TNP 12% received majority approval (60.52% of all Note Holders not including Plaintiffs) to proceed with the modification. [*See* Doc. # 29]. Defendant contends that the majority of Note Holders' approval of the Consent Solicitation's modifications means that there was not a default by TNP 12%. Defendant contends that such a modification was permissible under section 12(c) of the Subscription Agreement. Thus, I must interpret this clause of the Agreement.

Under California law, the rules governing the role of the court in interpreting a written instrument are well established. *See Wolf v. Walt Disney Pictures & Television*, 162 Cal. App.4th 1107, 1125-26 (Cal. Ct. App. 2008). The interpretation of a contract is a judicial function. *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging*, 69 Cal.2d 33, 39-40, 69

11

Cal. Rptr. 561, 442 P.2d 641 (1968).  In engaging in this function, the trial court "give[s] effect

to the mutual intention of the parties as it existed" at the time the contract was executed.  Cal.

Civ. Code § 1636. Ordinarily, the objective intent of the contracting parties is a legal question

determined solely by reference to the contract's terms.  Cal. Civ. Code § 1639 ("[w]hen a

contract is reduced to writing, the intention of the parties is to be ascertained from the writing

alone, if possible"); Cal. Civ. Code § 1638 (the "language of a contract is to govern its

interpretation").  Contract interpretation is essentially a judicial function to be exercised

according to the generally accepted canons of interpretation so that the purposes of the

instrument may be given effect.  *Parsons v. Bristol Dev.Co.*, 62 Cal. 2d 861, 44 Cal. Rptr. 767,

402 P.2d 839 (1965).  Whether a contract is ambiguous or uncertain is a matter for determination

in the first instance by the trial court.  *Beneficial Fire & Cas. Ins. Co. v. Kurt Hitke & Co.*, 46

Cal. 2d 517, 297 P.2d 428 (1956).  The question is one of law.  *Prickett v. Royal Ins. Co.*, 56 Cal.

2d 234, 14 Cal. Rptr. 675, 363 P.2d 907 (1961).  If the contract is found by the trial court to be

ambiguous or uncertain, it is primarily that court's duty to construe it after a full opportunity for

the parties to produce evidence of the facts, circumstances, and conditions surrounding its

execution and the conduct of the parties relative thereto.  *Beneficial Fire & Cas. Ins. Co.*, 46 Cal.

2d at 517, 297 P.2d at 428.

When there is no conflict as to the terms of a contract and its provisions are not uncertain

or ambiguous, its meaning and effect and the relation of the parties created thereby is a question

of law to be decided by the court.  *Consol. Theatres, Inc. v. Theatrical Stage Emp. Union, Local*

*16*, 69 Cal. 2d 713, 73 Cal. Rptr. 213, 447 P.2d 325 (1968); *see also Cachil Dehe Band of*

*Wintun Indians of Colusa Indian Cmty. v. California*, 618 F.3d 1066 (9th Cir. 2010).  When a

contract is clear and unambiguous, its interpretation is a question of law that may be resolved on summary judgment, subject to the independent review by an appellate court. *Lloyd's Underwriters v. Craig & Rush, Inc.*, 26 Cal. App. 4th 1194, 32 Cal. Rptr. 2d 144 (4th Dist. 1994). Here, I interpret the relevant portion of the Parties' Subscription Agreement.

Section 12(c) of the Subscription Agreement provides:

> [T]his Subscription Agreement and the Memorandum, together with all attachments and exhibits thereto, constitute the entire agreement among the parties hereto with respect to the sale of the Notes and **may be amended, modified or terminated only by a writing executed by all parties** (except as provided herein with respect to rejection of this Subscription Agreement by the Company).

[See Doc. # 28, Ex. 1, p. 5 (emphasis added)]. Defendant contends that this section of the agreement gave TNP 12% the authority to modify the terms of the Agreement. Plaintiffs contend that nothing in the Subscription Agreement, Memorandum, or Guaranty permitted such a modification and the modification was impermissible without Plaintiffs' consent. Additionally, Plaintiffs contend that language in the Subscription Agreement indicates the contrary, that such a modification would require Plaintiffs' explicit consent. [Doc. # 29]. Again, I agree with Plaintiffs..

Plaintiffs correctly note that Defendant's assertion is directly contrary to the clear and unambiguous language in the Subscription Agreement, which provides that the Note "**may be amended, modified or terminated only by a writing executed by all parties.**" [*See* Doc. # 28, Ex. 1, p. 5 (emphasis added)]. Additionally, the Consent Solicitation did not reference any part of the Subscription Agreement or Memorandum that permitted TNP 12% or TNP to modify the terms of the Notes in this manner. In the Consent Solicitation, TNP 12% unilaterally proclaimed

that "[t]o approve the proposal being contemplated in this Consent Solicitation, the affirmative vote of Noteholders holding a majority of the outstanding principal amount of Notes must be cast in favor of the proposal." [Doc. # 28, Ex. 6, p. 4].

The language in section 12(c) of the Solicitation Agreement is unambiguous and makes it clear that an amendment to the terms of the Note, like the one in the Consent Solicitation, requires the consent of all note holders. *Beneficial Fire & Cas. Ins. Co.*, 46 Cal. 2d at 517, 297 P.2d at 428 (holding that the trial court determines whether a contract is ambiguous); *see also* Cal. Civ. Code § 1636 (the trial court "give[s] effect to the mutual intention of the parties as it existed" at the time the contract was executed); Cal. Civ. Code § 1639 ("[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible"); Cal. Civ. Code § 1638 (the "language of a contract is to govern its interpretation"). Here, there was no such consent from Plaintiffs.

As a matter of law, TNP 12%'s failure to pay interest constituted a breach of the Subscription Agreement. Upon breach, Plaintiffs were permitted to request redemption, per the terms of the agreement. [*See* Doc. # 28, Ex. 2, p. 17 (explaining that TNP 12% is not obligated to redeem the Notes prior to the date of maturation "[u]nless an event of default under the Notes exists and the Note holders elect to declare the Notes due and payable.")]. TNP 12%'s refusal to redeem the Note was also a breach of the Subscription Agreement. *Id.* Because TNP 12% breached the Subscription Agreement, TNP became liable to Plaintiffs per the Guaranty Agreement. [*See* Doc. # 28, Ex. 8]. TNP's refusal to redeem Plaintiffs' Note thus constituted a failure to perform under the Guaranty Agreement.

14

The last element in Plaintiffs' breach of guaranty claim to be addressed is element four–that Plaintiff incurred damage caused by Defendant's breach.  Because this is a Guaranty Agreement, Plaintiffs have incurred damages of and are entitled to, at minimum their guaranteed investment of $100,000.  *Somers v. U.S. Fidelity & Guaranty Co.*, 191 Cal. 542, 217 P. 746 (1923) (explaining that a guaranty of payment is fixed by the failure of the principal debtor to pay at maturity, or at the time payment was guaranteed, regardless of whether the debtor could or could not pay the debt); *Pugh v. Porter Bros. Co.*, 118 Cal. 628, 50 P. 772 (1897) (explaining that under a guaranty contract the non-breaching party entitled to be compensated the principal and is not subject to any deduction for commissions earned or expenses incurred); *Goodman v. Severin*, 274 Cal. App. 2d 885, 79 Cal. Rptr. 555 (2d Dist. 1969) (the undertaking of a surety or guarantor is to protect the promisee against loss or damages caused by the failure of a third person to carry out his or her obligations to the promisee.); *Mahana v. Alexander*, 88 Cal. App. 111, 263 P. 260 (3d Dist. 1927).

No genuine dispute of material fact exists that Defendant breached the Guaranty Agreement.  Accordingly, Plaintiffs' motion for summary judgment with regard to their claims for Breach of Guaranty is granted, and Defendant's is denied.

**B.      Plaintiff's Unjust Enrichment Claim**

Under California's law of restitution, an individual may be required to make restitution if he or she is unjustly enriched at the expense of another.  *Ghirardo v. Antonioli*, 14 Cal. 4th 39, 57 Cal. Rptr. 2d 687, 924 P.2d 996 (1996); *F.D.I.C. v. Dintino*, 167 Cal. App. 4th 333, 84 Cal. Rptr. 3d 38 (4th Dist. 2008).  The phrase "unjust enrichment" is used in law to characterize the

result or effect of a failure to make restitution of or for property or benefits received under such circumstances as to give rise to a legal or equitable obligation to account therefor. *Cal. Emergency Physicians Medical Grp. v. PacifiCare of Cal.*, 111 Cal. App. 4th 1127, 4 Cal. Rptr. 3d 583 (4th Dist. 2003); *Lucky Auto Supply v. Turner*, 244 Cal. App. 2d 872, 53 Cal. Rptr. 628 (2d Dist. 1966). Thus, unjust enrichment is commonly understood as a theory upon which the remedy of restitution may be granted. *Doe v. Nestle, S.A.*, 748 F. Supp. 2d 1057 (C.D. Cal. 2010).

While there is no separate cause of action under California law for unjust enrichment, *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 108 Cal. Rptr. 3d 682 (4th Dist. 2010); *Castillo v. Barrera*, 146 Cal. App. 4th 1317, 53 Cal. Rptr. 3d 494 (2d Dist. 2007), unjust enrichment is synonymous with restitution. *Levine v. Blue Shield of Cal.*, 189 Cal. App. 4th 1117, 117 Cal. Rptr. 3d 262 (4th Dist. 2010), *review denied*, (Feb. 16, 2011); *Dinosaur Dev., Inc. v. White*, 216 Cal. App. 3d 1310, 265 Cal. Rptr. 525 (1st Dist. 1989). Thus, an action seeking a recovery for unjust enrichment is a claim for restitution, ordinarily based on a benefit conferred through mistake, fraud, coercion, or request, which ordinarily does not lie when an enforceable, binding agreement exists defining the rights of the parties. *AIG Retirement Servs., Inc. v. Altus Fin. S.A.*, 365 Fed. Appx. 756 (9th Cir. 2010), *cert. denied*, 131 S. Ct. 566, 178 L. Ed. 2d 413 (2010); *CRV Imperial-Worthington, LP v. Gemini Ins. Co.*, 770 F. Supp. 2d 1074, 1074 (S.D. Cal. 2010); *Cal. Med. Ass'n, Inc. v. Aetna U.S. Healthcare of Cal., Inc.*, 94 Cal. App. 4th 151, 114 Cal. Rptr. 2d 109 (4th Dist. 2001); Dinosaur Dev., Inc., 216 Cal. App. 3d at 1310. Unjust enrichment is a common law obligation implied by law based on the equities of a particular case and not on any contractual obligation, *Dintino*, 167 Cal. App. 4th at 333, and thus, a claim for

16

unjust enrichment is said to be inappropriate, and must fail, where express binding agreements define the parties' rights. *Maystruk v. Infinity Ins. Co.*, 175 Cal. App. 4th 881, 96 Cal. Rptr. 3d 494 (2d Dist. 2009). In particular, while generally parties are permitted to plead in the alternative, an allegation of a binding contract may nullify an unjust enrichment claim. *Klein v. Chevron U.S.A., Inc*., 202 Cal. App. 4th 1342, 137 Cal. Rptr. 3d 293 (2d Dist. 2012), *as modified on denial of reh'g* (Feb. 24, 2012), *and review denied* (May 9, 2012).

Here, because it is undisputed that Plaintiffs' claims are based upon an enforceable contract, under California law, Plaintiffs' unjust enrichment claim fails. Accordingly, I grant Defendant's Motion for Summary Judgment as to Plaintiffs' Unjust Enrichment Claim.

### III. Conclusion

ACCORDINGLY, I ORDER as follows:

1) I GRANT Plaintiffs' Motion For Summary Judgment IN PART, in regard to Plaintiffs' Breach of Guaranty Claim;

2) I GRANT Defendant's Motion for Summary Judgment IN PART, in regard to Plaintiffs' Unjust Enrichment Claim; and

3) Plaintiffs shall submit their supported damages by affidavit on or before 21 days from the date of this order, Defendant may respond 14 days thereafter, and Plaintiffs may reply to the response 14 days after its filing.

Dated: March  18 , 2014 in Denver, Colorado.

BY THE COURT:

   s/Lewis T. Babcock

LEWIS T. BABCOCK, JUDGE